The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Catherine E. Zeno presiding. Good morning, counsel. This is case number 4-240520, Robert Schilling v. Quincy Physicians & Surgeons Clinic, and Craig Love. Would counsel for the appellant, please introduce yourself. Good morning. This is Andrew Mahoney, counsel for the appellant, Mr. Schilling. Thank you. And will counsel for appellee, introduce yourself, please. Good morning, James Hanson for the appellees. Thank you. All right. At this time, Mr. Mahoney, you may begin your argument. Thank you, Your Honor. May it please the court, counsel, this is a unique case of first impression concerning a long and detailed juror note we've dubbed the surrender note. And this note contains a firm declaration, even using the term 100% believe, where the author of the note says that they believe the defendant was negligent, and they even include that this negligence impacted the care of Mr. Schilling. So this sets out that belief and says multiple times that they're voting for the defense only to end deliberations, in other words, to go home. And they even underline the word only when it's used each time. They underline it twice. And then after the notice issued, there's no further investigation into exactly what happened or the mindset of these jurors. And this promise to vote for the defense for a manifestly improper reason is later confirmed through the jury's agreement to a verdict for the defense and then polling where the author is presumably one of the 12 jurors says, yes, I agree to the verdict. And that fulfills the promise set out in that surrender note where they say, I'm going to vote for this reason. And we make the argument in our briefing that if this verdict is affirmed, really one of two things must be true, that one, the reason for coming to a verdict simply doesn't matter, provided that the jury signs the verdict form at the end of the day. And I don't really think that that's the case. I don't think the defense is arguing that that's the case. Or two, that the author of the surrender note changed their mind from an improper reason to a conveniently proper reason, despite there being no evidence of that. And this is where I'd like to focus on the idea of what is speculation and what is evidence. The fact in this case is, could I could I please good morning interrupt before we get to that point where we're talking about speculation, I'd like to ask a question about this surrender note first. You do argue, and I think it's your position that it's a promise or a guarantee that the author of this note was abandoning his or her conviction to just for the purpose of reaching a verdict. And prior to the surrender note being given, which was the morning of November 2nd, the trial court had received indication that the jury was deadlocked that the evening before. And the trial court articulated several times in response to the three motions for mistrial that this was not so unusual. It was an indication of dissent among the jurors and part of the deliberation process that jurors go through. Why can't we look at this surrender note as just a second attempt to get the trial court's attention to the fact that this jury was deadlocked and perhaps do something about it? Sure. Absolutely. Your honor, the difference in this case, and there's a body of law, and I think it's even discussed in the people versus Walker case is a court says, listen, we don't know the subjective state of mind of the jury. We don't know why they're deadlocked. We're not privy to that sort of information. And what distinguishes this case is in an odd situation, we do get very in-depth knowledge of the subjective state of mind of this author of the surrender note. They're saying, hey, this is why I'm doing this. I'm doing this because I think it's supported by the earlier deadlock is that, you know, the jury's deadlocked. We're not going to come to a decision. I see this as the only way out. And therefore, I'm voting only to end deliberations. And I am 100 percent convinced that the plaintiff is right. This is my belief. I'm 100 percent. I'm not changing that. So I think it's that view into the subjective mind where in the Walker case, they talked about how it was the jury's subjective assessment that it was deadlocked. Because in that case, the jury was saying, or I think the foreperson had said, you know, there's one other member that won't agree and we can't agree on the verdict. That's different than this juror saying, hey, this is my thought process, and I'm 100 percent convinced of it. So I think that's a distinction, Your Honor. Well, we know that after receipt of the surrender note that the trial court did give the prim instruction and you argue that your position is that the prim instruction was coercive. But of course, we know a prim instruction is designed not to be coercive. I mean, what about the circumstances here change that? And if so, how? Sure. I think this goes to that Arroyo case that we set forth in our briefing, and that defines coercion for us, where it says impermissible coercion occurs when jurors surrender their honest opinions for the mere purpose of returning a verdict. And I am hard-pressed to imagine a note that could not more perfectly embody the concept of coercion because that juror is essentially writing out that I am surrendering my honest opinions for the mere purpose of returning a verdict. And it's our opinion that at this point, the coercion has really kind of manifested at that point, at the time of the note being issued. And issuing a prim instruction after that, after the coercion has occurred, is just further coercive. And I think that the Illinois courts, when they analyze whether a prim instruction is proper, it can be coercive because otherwise they wouldn't be analyzing whether or not it is proper. And the purpose of it is to break a deadlock. I think the instruction is for deadlocked juries. But I think that that is more intention for juries that have a routine deadlock, not that are hopelessly deadlocked. And I think that any indication or any instruction to the jury after the note is issued to tell them to come to a verdict is inherently coercive, if that answers your question. So how do we attach a thermometer to the level of deadlock from our perspective? There is a test in—I think it's People v. Arroyo that talks. It sets forth a six-part test that says there's these different factors that have to be gone through, and that includes the statement of the jury itself about whether or not— I'm sorry, bad question. That's for our review purposes. My question really was more, at the time this happens, how is the court supposed to attach a thermometer to the level of deadlock? Well, I think at this point, the declaration by the juror that they're going to vote for an improper reason is so clear that it doesn't fall within a gray area here. If a thermometer goes from 1 to 100, it's not gauging a thermometer sitting around 40 to 60. This is the 100, because this is per se— How many times have you had jurors who said they were deadlocked, you let them deliberate a while longer with or without a prim instruction, and voila, they come back with a verdict? Yeah, and I think that the court points out that there are ebbs and flows in all deliberations, and I would tend to agree with that. But the difference is when these courts talk about not having any subjective knowledge or knowledge of these subjective thoughts because here we have a juror setting forth this is the reason why I'm going to do this. Yeah, but you didn't freeze – you freeze everything right at the note. That's kind of my – the question that I've got is what transpired after the note, and does not – doesn't that contribute to the court's determination as to whether there was an issue? And our opinion is, is that that note mandated immediate mistrial at that time, and being that there wasn't one— I understand that's your position, but what transpired after the note? The prim instruction was issued, but— How much time passed? I think it was an hour or two, something like that. Then they gave the prim. Yeah. Then the court – then the jury submitted additional questions, substantive questions about evidence and burdens of proof. Yeah, they did, and I think the issue— So that's clear that additional deliberation is going on. There's clear someone's deliberating, but the issue is— That's true in every case. We never know who may have made up their mind the minute they walked in the door or who makes up their mind at the very last minute, and we're not supposed to try to delve into that, are we? Not generally, but the problem is – and this is dealt with in the case of U.S. v. Fatah where it's said that there are – that there's two competing interests here, or there's two interests really. The secrecy of deliberations is critical, but there is a competing interest that says it's the jury's proper execution of its duties, and in that case, a court may investigate. And in that case, there was a juror who was accused of being or not – or refusing to deliberate, and then I think that juror had made a comment to the court. Wasn't that the one where the guy puts his hands on somebody and he's— Yeah, yeah. Okay. That's a little different what we've got here. Well, that was – he kind of defended himself, and the point of that case that I take away anyway is he says he makes a subjective statement that says I'm going to hang this jury to the clerk of court. And that is a little bit of insight into his mind and what his intention is, and I think that glimpse into the subjective raises some idea that, hey, you have to investigate this a little bit in order to determine, are you in fact voting for this verdict for the proper reason? Because otherwise, that note remains unrebutted, and it's speculation to assume that this juror changed their mind from an improper reason to a conveniently proper reason. Well, I don't understand. I mean, I think that's part of what Judge DeArmond is getting at. More happened. Perhaps he took the prim instruction seriously. And I think that's the problem is perhaps he— He took it seriously in terms of his duty as a juror, not in terms of, oh, they're beating me over the head, I have to give up. I think that's the issue, though, is perhaps he did, and the court even noted that, that if the juror changed their mind, but here we have a very clear declarative statement saying this is why I'm doing this, and then we're just assuming that maybe he did change his mind after the fact. I'm not assuming anything. I'm going by what he said when the jury was polled. Yeah, and that's fulfilling that promise that he made because he said, I'm going to vote for a defense verdict. This is what I'm going to do. And then he did, but the documented improper rationale is—it's our position that that's the problem here is that you can't have that sitting out there without there being some investigation into that. Well, didn't the trial court investigate when it pulled the jury? I mean, everybody answered the question, was this and is this now your verdict? Everybody answered yes. And I think the issue, at least our position is, the issue is there wasn't anything beyond that, because that's along the lines of just saying, did you sign this form? Are you agreeing to this? Was this and is this now your verdict? Not, was this and is this now your signature? Was this and is this now your verdict? Yeah, and the note says that I'm going to vote for the defense for this reason. I don't think it does anything to negate the actual rationale set forth within the jury note. He still says I'm going to vote for the defense. Well, except he answered—he or she answered the question in the affirmative that he was—he or she signed that that was his verdict or her verdict at that time. There was the opportunity to answer that question differently. Yeah, and I think it doesn't remove the idea, though, that there's the rationale given before that, because there was no questioning into the rationale. And there was also one juror who gave a hesitant pause, and I think that the note needs to be read in conjunction with polling. It's almost like if the note was read out loud during polling, and I think if that was the case in conjunction with the word yes, I don't think there's any question that there would need to be some additional investigation into, hey, you said yes, but you also said all this other stuff that you're giving us an improper rationale. So I think it needs to be read in light of that juror note. And I think I only have four minutes left, Your Honor, if I could save that for rebuttal. Well, you have time for rebuttal anyway. You have five minutes for rebuttal, so if you want to use the four minutes, go ahead. Okay, thank you. So I think that in addition to being coercive, that this was jury misconduct. And I think that that is the reason that there needs to be more polling in this case, because there's that competing interest that otherwise the note is somewhat, it just hangs out there. And I think that it casts doubt upon whether or not that juror did vote for this for the proper reason. And I think it's pure speculation to say, well, maybe the jury changed, or maybe the juror changed their mind, maybe they didn't. Because our courts are governed on evidence, and we go based on evidence. And in this case, all the evidence supports the idea that this is the reason why I did it, and I did it after that. I don't think that. Counsel, I can look at that same evidence and say, you know, anybody who's willing to put out a note like that, when given an opportunity in open court to express something otherwise, would be just as assertive. I mean, in all of your experience, have you ever seen an individual juror submit their own note separate from any note that the foreperson or the rest of the jury would submit? That a separate juror does it? Just one juror. I mean, because honestly, in all of my years, I've never seen one juror send out their own individual note. I don't think … And I'm kind of wondering, you say the evidence could only mean this, and my perspective is, well, if they've got enough gumption to send out their own note, you know, they're clearly bucking the rest of the people in that room, apparently. That when they're brought out and given the opportunity, why wouldn't they be just as assertive as they were? I think that involves, respectfully, a little bit of speculation, though, Your Honor. Honestly, I think your whole argument is speculation, but we just differ on what we want to speculate about. Well, Your Honor, and we're just saying that this is what the note says, and this is when they voted yes. And to say that, well, the type of person who would write this kind of note is predisposed to be verbal during deliberations. I think the appearance in the courtroom, you know, that official, the judge is sitting there watching you, I think that adds a different pressure to what these jurors are doing rather than when they're in the deliberation room. I just think it's a little bit different, Your Honor. Or the reverse. They have the freedom of being out in the courtroom in front of the judge. They're no longer oystered with this other bunch of jurors, and this is their opportunity to express their displeasure at what's transpired.  And my point really is, aren't these the things that the trial court is confronted with and that the trial court has to make that determination based upon what they see in front of them? And when the trial judge, even in spite of the note, sees that he's got continued deliberations, additional substantive questions being asked, additional deliberation after the prim, and the person then doesn't express anything differently, you're saying that the court should then speculate. And conduct additional inquiry. Respectfully, I don't think it's speculation because that's what the note says. That's the documented record in this case. Well, again, you fix everything at the time of the note, and then you take no account of anything that's happened since then. And I think that is the fallacy of the argument. Did you want me to respond, Your Honor? I'm sorry. I'm sorry. No, that's fine. The last of your time, I apologize. No, that's okay. If you want to respond, and I have one quick question after, so you may respond to Justice Stearman. Thank you. And yeah, we do. We fix everything at the time of the note. And then I think we argue in the alternative in our briefing and everything that if there is a way to fix it, there just has to be some sort of documentation. Or statement by the juror undoing their motivation, their state of mind. Because otherwise that state of mind is forever set in the record. And I don't think a prim instruction, that's a court saying something. That's not the juror or the author of the note saying something back. So I think that's our position, Your Honor. Thank you, Counsel. So my question is somewhat related. So in the context of looking at whether the trial court abused its discretion here, isn't it your burden to show that this juror did not change his or her mind after writing that note? And there isn't anything in the record that shows that they didn't change their mind. Well, I think the only part of the record that demonstrates any subjective state of mind is the note. Because the note provided that rationale. This is why I'm going to take this action. And then that action was taken. So I don't think that the polling or the prim instruction undoes that at any point. So I think that it's established from that point on, and we have to believe the juror at their word when they say, I'm 100 percent convinced of this. This is my opinion. So I don't think it is. Not when they say, yes, that was and is my verdict. And respectfully, Your Honor, I think that that's confirmation of the promise that they made in that that juror note that says, I'm going to vote for the defense.  Okay, thank you. Thank you, Counsel. Justice Connick, any further questions? No. Okay. Anything further, Justice Stearman? At this time? Okay. Thank you. Mr. Hanson? Thank you, Your Honors. Counsel, as has been brought out by the court, it's our position that the decisions of the trial court should be affirmed. I'll take the argument first on the deadlock jury, which is basically a two part argument. One, that opposing counsel feels the jury was hopelessly deadlocked. And then two, as has been brought out, that the note is their point in time in which they believe nothing after that could have been done to address the situation. First, I think it's important to realize that the trial court in this case, to reverse, it's an abuse of discretion standard. And that's a very high standard in which opposing counsel has to show so arbitrary or fanciful that no one, no reasonable person would have done what the trial court did. And as case law cited in our brief shows, the trial court is the determinator of whether or not the jury is deadlocked. And the trial court has the ability to say, I'm not accepting where you're at right now, and I want you to continue to deliberate. And I think what's important in this case is if we look at what happened, let's take the first night, when the first juror note came back about them being unable to reach a decision. This is a medical negligence case that had been tried for eight days. And at that point in time, the jury had heard very complex medical issues involving a Charcot arthropathy and a Liz Frank fracture. And I've been practicing for a long time and had many medical negligence cases. That is an odd type case. And they had only been deliberating that evening for about four, four and a half hours. And I think the record is clear. The court brought us in. We discussed the issue and eventually he sent them home to bring them back the next day. They came back the next day, started deliberations, and within 45 minutes is when we get what has been referred to as the note. At this point in time, the court determined what action to take next. The prim instruction is what has been determined and the Walker case, I believe, is the one that refers to it as well as the Arroyo case. It has been decided that what the court must do is give a instruction that is non-coercive, concise, simple, and that's what that is. Let me stop you there when we're talking about coercion and prim. We do know that certainly under certain circumstances where a jury is deadlocked, the prim instruction, giving the prim instruction can be deemed coercive where it would lead to reaching a verdict that would not have otherwise been reached. And we know, of course, there's no rigid formula. This is up to the trial court. But if we look at the Kimball case, our Supreme Court, and there's in paragraph 46, and I'll just paraphrase some of this, certainly trial court's discretion whether to give prim at any time, the trial judge is in the best position to decide if it would be helpful or, and here's where I quote, instead coercive, leading the jury toward a verdict it otherwise would not have reached. So here, is it not clear that prim, giving prim was coercive under the circumstances as opposing counsel mentioned in his argument, and you talked about some of the timeframes here, there was a first note sent out at 7 p.m. after five and a half hours of deliberation that the jury could not reach an agreement no matter how long they sat there. And the trial court then said continue deliberating, sent them home at 7.55 p.m. Next morning, they come back 9.02, 9.40, as you had mentioned, a short time later, 40 minutes later, the surrender note comes and underscores not only perhaps this personal juror's position, but that there can be no verdict reached because of that. And then the trial court decides to give prim. That's done at 10.10. And it isn't much before 50 minutes later, now there is a question in between regarding substantive law that Justice DeArmond was referring to with opposing counsel, but very shortly after that, the verdict is reached. Under those circumstances with the content of the surrender note, the timeframe I talked about, and the fact that the jury is deadlocked, we don't have to necessarily mention or ascertain the degree of deadlock here, but it's deadlocked. Why isn't giving prim under these circumstances coercive? Because it seems like it led to a verdict that perhaps it wouldn't have otherwise. So a couple of responses to your question. Our position is, and I believe it is not coercive for the following one, in citing the Kimball case, if you go on further in that paragraph, the court said, we will not second guess the trial court's decision or substitute our judgment for it. And when there is discretionary decisions, a range of outcomes are possible. So let's look at the facts as it relates to Kimball. The prim instruction is given. And I don't think there's anything in there. In the instruction itself, in the language as read, is coercive. In fact, that instruction says, do not give up your beliefs or your convictions. But what is important in this case is the jury went back, and even though it may have been 50 minutes to an hour, we clearly had further deliberations. We clearly had somebody, and it came out through the foreman, or foreperson, ask questions which were very substantive, which were, please, we want a definition of what is the standard of professional negligence. We want to see Dr. Honaker, which was the plaintiff's standard of care experts, deposition, and then exhibit. So there clearly was further deliberations and discussion ongoing. The time, I think, is critical, as is that other question, because when we see that, you can see that the alleged coercion is not there, in my opinion. It's the, you know, the plaintiff, the appellant is arguing just giving the instruction itself was what was coercive. That is it. And then they didn't really do anything else. Our position is they clearly did something else. They went back and they deliberated. That's what they were supposed to do. That's what the prim instruction is there for. It is to send them back and to have them deliberate further, which they did in this case, which they then asked the questions, the verdict came in, which I think then goes to the next question, which I'd like to address, I think, because it has to be taken in totality of circumstances, which is the polling. That's what I was going to ask about next. Right. Okay. So, well, if you if you don't mind, please, why wouldn't enhanced polling have eliminated any doubt or concern about the coerciveness, let's say, of a prim instruction. And I think the case law is, is instructive on this. What we don't have here is the negative. We do not have a juror that rejected the verdict that, as in the, I believe it's the Kellogg case where the, the juror said, you know, to the question was this then and this is now your verdict. No, and no, we didn't have that here. And what is interesting is we are now getting into the appellant wanting this court to substitute what the trial court heard in the response. The observation of the juror and the tone, because what the argument is, is there was a long pause. What is long? We don't have the time. It's not recorded. Is that 10 seconds? Is that 4 seconds? Is that 15 seconds? And we have a sigh. Well, okay, what do we do then? If we have a juror who rolls their eyes? What if the juror made a facial grimace? Are we then going to impose on the trial judge that you then need to step in for any of those? It's a discretionary act by the way. But then is this trial judge supposed to ignore that surrender note? I mean, I guess that's the question. Does that not inform what the trial court, the trial court's judgment or discretion should be under these circumstances? This is, I mean, I think we've said this is not really business as usual. And so why should the trial court treat this as if it were business as usual for a jury and deliberations? Because under that scenario, you are requesting the trial judge to not assume the opposite, which is I gave the prim instruction. They went back and deliberated more. And like, as is other cases before me, I've now got a jury that talked about it further came to a verdict. I'm giving them an opportunity, which is all the trial court has to do. He has to give those jurors an opportunity to assent or dissent to that verdict in open court, which was done. If we just assume the opposite, then we're flipping on the head that the trial court was there. He heard the response. He heard the demeanor. He heard the tone. And quite frankly, the record is devoid of it. But I don't, and I was the trial attorney. I don't recall, you know, there may have been somebody else's tone was a little off. I mean, I, what if we're just getting into replacing the best position of the trial court to make the decision here under the totality of the circumstances, which was got the note, gave the prim further deliberations, further questioning. They got a verdict. I bring them in. I do the polling. And there is nothing that says the trial court has to go on beyond giving the jurors the ability to express their disagreement during the polling. And we didn't have that here. We had nobody who said, no, that's not that's not my verdict. So, is, is, is body language enough to trigger that? I mean, we don't have the words, but we have a side. We had the note from before. That's a good question. I that that is the proverbial can of worms. I mean, what? So, is it a side? And as going to my prior argument, is there is there going to be a formula on the length of the pause on the how what was the pitch of the side? What if somebody goes like this and rolls their head? Is that is that something that the trial judge has to now all of a sudden? Okay, you're 63. you kind of move your head like this. What did that mean? Are we going to inquire receiving require the trial judge to in a polling situation always delve further under those circumstances? And I think that's why the case law and the standard is what it is. This court has to find that the trial judge abuses discretion and under the circumstances as he sat there in that courtroom was his decision to do what he did, which was here. The yes, take that under the totality of the circumstances observe the juror. Was there such an abuse of discretion that no reasonable person sitting in his shoes could have decided to do what he did. And that's where I think this court should affirm the decision, because that standard and that argument has not been met by the appellant in this case. Thank you any any further argument at this time. I would I would just add on the jury instruction. Finally, that the judge can select the giving or non giving of a jury instruction. He is giving a wide latitude and discretion. And in this case, as was set out on the record, the rationale for giving the failure to diagnose instruction under jury instruction number 11, based on the testimony that was heard from a wide range of medical experts and witnesses was proper. And we believe that should be affirmed as well. Thank you very much counsel justice connect any further questions. No, justice. Okay, thank you very much. Mr Mahoney. You have 5 minutes for rebuttal. Thank you, your honor. I think your honor pointed out well, that this wasn't business as usual. I think this note was such an irregular circumstance. And I looked, I searched in Illinois law, I searched, I did the West law search for every state in the United States. And I couldn't find another case that had anything like this where a juror gave such a descriptive subjective rationale behind why they were going to agree to a verdict and what their thought process was in reaching that. So, I think this is a very unusual circumstance. That justified a little bit more of a response. And so how does an unusual circumstance get us beyond the standard of review? That is to say that no reasonable person would have done what the trial court did here. I mean, we all know I've just add, you know, we know that so many different things happen in a courtroom during the course of a trial. Each is different some unusual. So. If you want to respond, please to the question. Sure, your honor. And it comes down to what's on the record is we have this juror note, and we have a promise to agree to a verdict for the wrong reason. I think we use the example in our briefing that let's say the juror had said, I'm going to vote to convict a defendant based on race. And that is never dealt with again. And, you know, the juror says, yes, this is my verdict at the end. And, you know, if that's the case, even if a prim instruction instruction is given not to, you know, vote to convict based on race. I don't think there's any question that that would be something that would need to be explored or delved into a little bit in order to determine, hey, you change your mind and you didn't vote for that reason. Correct. Just to make sure that there's not something embedded in the record that is a manifestly improper reason to agree to a verdict. So I think that that subjective rationale being out there does give a standard that something had to be done to cure that. And giving the prim instruction and sending them back to deliberate, I don't think cures that because from the juror's perspective, it's not like the juror could have gotten up and left. You know, they were forced into that situation. There's nothing that could have been done. So if the jurors went back there and sat and didn't deliberate and then agreed at the end, just like they said they would, I think that's just an improper reason. So I think that is an abuse of discretion because what the evidence shows is an improper subjective rationale. Is it possible to view enhanced tort juror as being more coercive than the prim instruction? I think it depends on how that's done, Your Honor. Well, the trial judge elected not to do it.  Instead, he gave the prim, which says don't give up your opinion, but remember to reflect upon and consider the views of everybody else. And for basis, don't do this just for the purpose of returning verdict. I don't want you to do that. The system doesn't want you to do that. I think that it's quite possible that would have an influence on a dissenting or potentially dissenting juror. I think it's harder when a statement has already been made to the contrary, because in my mind, the genie is out of the bottle at that point. Well, the genie is out of the bottle, but we tried to put it back in the bottle. And the question is, did we? And then going beyond the prim instruction and having enhanced for deer puts a lot of pressure on every juror, not just the juror that you're saying, hey, buddy, are you the one that told me that you, you know, you were just going to do this? I think over that didn't work, did it? We still had to deliberate. Now, what the hell is going on? You know, that'd be heavy handed questioning, but. How do we know how that would go? It comes to that case of US versus where the judge did conduct some individual questioning of these jurors. They went through and there's actually select questions, and I realize the 3rd circuit case, it's a little bit different. But there are some example or. Do you want me to finish your honor? Yes. There are some questions that are proposed in that circumstance. To delve into a little bit of what was going on, and I think in this circumstance, there would have to be some sort of individual questioning of jurors to remove the potential course of influence of other jurors. By the judge that just says, is it did you write this note? We just want to make sure there is no coercion because the judge even asked the judge kept the 4 person after the jury was dismissed to make sure that the form was filled out correctly. And he even asked the 4 person. Were you coerced or maybe use the term undue influence or something to sign this form? And I think a very gentle questioning could say along the lines of, you know, is this based upon? Did you base your verdict upon the facts in the law? And if you did write the note, did you change your mind after that? I think that could be gently done. Your honor. All right, thank you. Anything further justice connect.  And justice, any further questions. Thank you counsel for your arguments today. They were excellent. And at this time, the court will take the matter under advisement and render a decision in due course. Our proceedings for the day are ended.